BEHRENS *v.* THE FURNESSIA.[1]

*(District Court, S. D. New York. June 1, 1888.*

SHIPPING—CARRIAGE OF PASSENGERS—PERSONAL INJURIES—UNGUARDED HATCH.
Libelant, a steerage passenger on the steam-ship F., in coming down from the deck to go to his quarters, fell through the fore hatch in the lower between-decks, breaking his leg, for which injury this suit was brought. The hatch was ordinarily kept covered, and passengers were in the habit of walking over it. On the occasion in question the hatch had probably been opened to bring up provisions, but there was no light to enable libelant to see whether the hatch was open, nor was there any rail or guard around it. The libelant testified that he had never seen the hatch open, and did not know that it was liable to be open. No caution had ever been given the passengers in regard to the hatch. *Held,* that the vessel was liable for libelant's injury, his damages being fixed at $1,600.[2]

In Admiralty. Libel for damages.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

[2] If a common carrier of passengers omits any reasonably practicable precaution tending to insure the safety of the passengers, the omission is such negligence as will make him liable to a passenger who, without fault himself, is injured thereby. Anderson v. Scholey, (Ind.) 17 N. E. Rep. 125. See note, Id.

See, also, as to the liability of common carriers for injuries to passengers, resulting from the carrier's failure to use the proper degree of care, Merwin v. Railway Co., 1 N. Y. Supp. 267; Dougherty v. Railroad Co., (Mo.) 8 S. W. Rep. 900, and note; Graham v. Railway Co., (Minn.) 38 N. W. Rep. 812; Railroad Co. v. Pillsbury, (Ill.) 14 N. E. Rep. 22, and note.

*John A. Weekes, Jr.*, and *James Parker*, for libelant.
*Wing, Shoudy & Putnam*, for respondent.

BROWN, J.   The libelant, a young man 24 years of age, in September, 1885, took passage on the steam-ship Furnessia from Glasgow to New York.   He was a member of his father's family, for whom through tickets were purchased from Hamburg to Nicollet, Minn., via Glasgow and New York.   On the second day out, he and his younger brother were separated from the rest of the family, and assigned to the quarter of the unmarried men, in the lower between-decks.   His berth was a little forward of the fore hatch on the starboard side.   The hatch was about 15 feet long by 12 wide, and was usually covered with a box cover.   The lower flight of the stairway opened towards the stern of the ship, and was about 12 or 15 feet forward of the hatch. ,The hatch was usually kept covered, and the passengers, in going to and fro from their berths, were in the habit of walking over it.   When four or five days out, the libelant, on coming down from the upper deck to go to his quarters for supper, between 5 and 6 P. M., fell down the hatchway, which was at that time open, and fractured his leg a little above the ankle.   He was treated on the ship, and after arrival for 77 days in the Long Island hospital.   Sixteen months later he filed this libel to recover his damages.   The weight of evidence is that there was not sufficient light to apprise the libelant, as he went down to go to his quarters, that the hatch was open.   Had the proof been clear that the hatches above were open, I should have had no doubt that there was sufficient light to enable a person using ordinary care to see that the hatch was open.   But the preponderance of proof is to the contrary.   The lamps were not lighted, and there was no guard or protection around the opening, save the low coamings, about 8 inches high, over which, when the hatch was covered, the passengers were accustomed to pass.   There was a passage-way of about four feet in width on either side of the hatch.   The hatch had probably been opened for the purpose of taking up provisions; but during the considerable interval that had elapsed before the libel was filed, the seamen had been discharged, and the ship was without means of proving just what had been done, or why the opening was left unprotected.   The habit of passengers to cross the hatch-covers could not have been unknown to the officers of the ship; and in the narrow space available to the steerage passengers, its use, more or less, for that purpose was almost inevitable. It was the clear duty of the ship to provide reasonable security against danger, when the hatch was temporarily open, by means of a rail or guards of some kind, and by sufficient light to enable the unusual danger to be perceived.   The ship is therefore legally answerable for not having done so.   .

The question of concurrent negligence on the part of the libelant is one of some nicety.   Had the proof shown that the libelant knew that the hatch was liable to be open during the dog-watch in the afternoon, when provisions were procured from the hold, if wanted, it would be difficult to acquit him of negligence in attempting to cross the hatch during

those hours, when it was so dark that he could not see whether the cover was on or off. It is not common prudence for a person to step upon a hatchway in the dark, when he knows the cover is liable to be off. The brother of the libelant had seen this cover off a day or two before. The libelant testifies that he had never seen it off, and did not know that the hatch was liable to be open; and that he and the various other passengers in that part of the ship were accustomed to cross it frequently. No caution had ever been given to passengers in this respect, nor any prohibition against passing over the hatch; or, if given, there was no proof of it.

As respects the amount of damages recoverable, there is much diversity of view in the judgment of the medical experts who examined the libelant as to the permanent effect of his injuries and the extent of his disability. The libelant was brought up as a farmer. Upon his discharge from the hospital he went to Nicollet, upon a farm purchased there by his father, and has worked upon it ever since. He testified that he continued to suffer considerable pain, and, though able to do all kinds of ordinary farm work, that he cannot do as much as before the injury, being obliged to rest oftener, through weakness and pain occasioned by the fracture. He estimates his loss of working power and value at about one-half. The respondent's expert estimated it at from one-seventh to one-tenth. The libelant testified that with such land as he would be able to cultivate he could make at farming from $800 to $1,000 a year, if perfectly able-bodied. He has, however, no property of his own, and works only for his father, as a farm hand. The wages of an able hand at Nicollet, he testified, are about $208 a year, besides board. In the case of The Juniata, 93 U. S. 337; The City of Panama, 101 U. S. 453; and of The Washington, 2 Ben. 227, 9 Wall. 513, the injuries, the pain, and the final disability were much more severe. In this case, the disability is but partial, and its actual degree not very satisfactorily established. The limb is a little shorter; but that alone would not affect its use. The curvature below the knee is a little increased, and the foot is a little incurved. The libelant's general health is good. His expert, judging from the general pain in the knee, and a little irregularity in the joining of the fracture, which formed a slight displacement in the axis of support, regarded the pain in the knee as likely to increase, rather than diminish. There is no evidence, however, to show any increase of pain during the past year; nor is there any circumstantial evidence to corroborate the libelant's testimony as to any considerable pain still suffered from the injury. On the whole, the case more nearly approaches that of The Grecian Monarch, 32 Fed. Rep. 635, though attended by some circumstances which would entitle the libelant here to a larger award. On the other hand, the libelant's delay in prosecuting his suit for 16 months after his substantial recovery, the ship's loss of testimony in the mean time, the somewhat speculative character of the suit, to be inferred from its prosecution in forma pauperis, notwithstanding the comfortable circumstances of the libelant's father, cannot be wholly ignored. I allow him $1,600 and costs.